

1  Brian S. Kabateck (#152054; bsk@kbklawyers.com)
   Richard L. Kellner (#171416; rlk@kbklawyers.com)
2  Reza Sina (#250428; rs@kbklawyers.com)
   **KABATECK BROWN KELLNER LLP**
3  644 S. Figueroa Street
   Los Angeles, CA 90017
4  Telephone (213) 217-5000
   Facsimile (213) 217-5010
5
   *Attorneys for Plaintiffs and the Class*
6

7

8                    **UNITED STATES DISTRICT COURT**    **EDL**

9         **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11  MEOR ADLIN, individually and on        **CASE NO. 7    6410**
    behalf of all others similarly situated;
12                                          **CLASS ACTION COMPLAINT**

13              Plaintiff,                  **COMPLAINT FOR VIOLATIONS OF
                                            THE SHERMAN ANTITRUST ACT**
        vs.                                 **15 U.S.C. § 1**
14
    AIR NEW ZEALAND, ALL NIPPON
15  AIRWAYS, CATHAY PACIFIC               **JURY TRIAL DEMANDED**
    AIRWAYS, CHINA AIRWAYS, EVA
16  AIRWAYS, JAPAN AIRLINES
    INTERNATIONAL, MALAYSIA
17  AIRLINES, NORTHWEST AIRLINES,
18  QANTAS AIRWAYS, SINGAPORE
    AIRLINES, THAI AIRWAYS, UNITED
19  AIRLINES,
20
              Defendants.
21

22      Pursuant to the Federal Rules of Civil Procedure, Plaintiff, on behalf of and all

23  others similarly situated, hereby bring this action for treble damages and injunctive

24  relief under the federal antitrust laws of the United States, Section 1 of the Sherman

25  Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Sections 4 and 26 of the

26  Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15, 26 ("Clayton Act") against

27  Defendants. Plaintiffs complain and allege upon information and belief, except as to

28

- 1 -

those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.     This action arises from an international conspiracy among certain airlines to fix, raise, maintain, and/or stabilize prices for long haul passenger transpacific flights to and from the United States ("Passenger Air Transportation"), and for fixed fuel surcharges on this transportation ("Fuel Surcharges"). Fuel surcharges are fees charged to passengers by airlines purportedly to compensate the airlines for increased fuel costs.

2.     Plaintiff, on behalf of all persons and entities that purchased Passenger Air Transportation to and from the United States, from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to August 2007 (the "Class Period"), brings this action to recover treble damages and injunctive relief for violations of the United States antitrust laws.

3.     At all relevant times herein, Defendants were airlines that conducted and sold Passenger Air Transportation and charged fixed Fuel Surcharges on that transport, to airline passengers in the United States and throughout the world, including but not limited to flights to and from Los Angeles and to and from San Francisco, California. Los Angeles International Airport ("LAX") and San Francisco International Airport ("SFO") are considered the international U.S. gateways to Asian and Pacific countries. The U.S. Department of Transportation reported that in 2005, LAX and SFO were ranked in the top U.S. passenger gateways to the world in scheduled passenger service. That year LAX and SFO had 24.6 million gateway passengers, with the foreign share of the passengers at an average 67%.

4.     As further alleged herein, during at least the Class Period, Defendants agreed, combined, and/or conspired with each other to fix, raise, maintain, and/or stabilize the prices of Passenger Air Transportation and Fuel Surcharges thereon. As

- 2 -

1    a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the other

2    members of the Class paid artificially high prices for Passenger Air Transportation

3    and Surcharges thereon, and have been damaged accordingly.

## JURISDICTION AND VENUE

5    5.    This Complaint is brought under Sections 4 and 16 of the Clayton Act,

6    15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and

7    the costs of this suit, including reasonable attorneys' fees, against Defendants for the

8    injuries sustained by Plaintiff and the members of the Class by reason of Defendants'

9    violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

10    6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

11    1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12    7.    This Court has *in personam* jurisdiction over each of the Defendants

13    because each was engaged in an illegal price-fixing scheme and conspiracy that was

14    directed at and/or caused injury to persons and entities residing in, located in, or

15    doing business in the Northern District of California and throughout the United

16    States.

17    8.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and

18    28 U.S.C. § 1391(b), (c), and (d) because during the Class Period many of the

19    Defendants resided, transacted business, were found, or had agents in this district,

20    and because a substantial part of the events giving rise to Plaintiffs' claims occurred,

21    and a substantial portion of the affected trade and commerce described below has

22    been carried out, in this district.

## MULTI-DISTRICT LITIGATION

24    9.    Venue is also proper in the Northern District because that court presides

25    over the multi-district litigation In re International Air Transportation Litigation,

26    MDL No. 1793, The Hon. Charles R. Breyer presides over the case, and the Court

27    has and will be called upon to address complex issues including jurisdiction, the

28    scope of relief which may be accorded, the application of United States' antitrust and

CLASS ACTION COMPLAINT

airline law, notice and claims procedures for class members within and outside the United States, and the administration and distribution of any funds which may be obtained through settlement and judgment.

## PARTIES

### A.    Plaintiff

10.    Plaintiff Meor Adlin is a legal resident of the State of California, County of Alameda.  Plaintiff Adlin purchased Passenger Air Transportation and paid Fuel Surcharges thereon from Defendant Singapore Airlines during the class period, and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

### B.    Defendants

11.    Defendant Air New Zealand is a New Zealand company with its principal place of business at Quay Tower, 29 Customs St. West, Auckland, 1020, New Zealand.  Air New Zealand conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

12.    Defendant All Nippon Airways is a Japanese company with its principal place of business at Shidome-City Center, 1-5-2, Higashi-Shimbashi, Minato-ku, Tokyo 105-7133, Japan.  All Nippon Airways conducts Passenger Air Transportation throughout the world, including into the U.S. and especially California.

13.    Defendant Cathay Pacific Airways is a Hong Kong-based company with its principal place of business at 9 Connaught Road, Central Swirel Housepox Box I GPO, Hong Kong K3.  Cathay Pacific Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

14.    Defendant China Airlines is a Taiwanese company with its principal place of business at 131 Nanking E Rd., Section 3, Taipei, Taiwan.  China Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

- 4 -

15.     Defendant EVA Airways is a Taiwanese company with its principal place of business at 16F-1, No. 207, Fusing Road, Taoyuan City, Taoyuan County, Taiwan.  EVA Airways conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California,

16.     Defendant Japan Airlines International is a Japanese company with its principal place of business at 4-11, Higashi-Shinagawa 2-chrome, Shinagawa-Ku, Tokyo 140-8605, Japan.  Japan Airlines International conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

17.     Defendant Malaysia Airlines is a Malaysian corporation with its principal place of business at MAS Complex A, Sultan Abdul Azia Shah Airport, 47200 Suband, Selangor Darui Ehsan, Malaysia.  Malaysia Airlines conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

18.     Defendant Northwest Airlines is a Delaware corporation with its principal place of business at 2700 Lone Oak Parkway, Eagan, MN 55121.  Northwest Airlines conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

19.     Defendant Qantas Airways is an Australian company with its principal place of business at 203 Coward Street, Qantas Centre, Mascot NSW 2020 C3.  Qantas Airways conducts Passenger Air Transportation throughout the world, including into the United States, especially California.

20.     Defendant Singapore Airlines is a Singapore company with its principal place business at Airline House, 25 Airline Road, 819829 Singapore.  Singapore Airlines conducts Passenger Air Transportation throughout the world, including direct transpacific flights into the United States, especially California.

1       21.    Defendant Thai Airways is a Thailand company with its principal place

2  of business at 89 Vibhavadi-Rangsit Road, Bangkok, Thailand 10900. Thai Airways

3  conducts Passenger Air Transportation throughout the world, including direct

4  transpacific flights into the United States, especially California.

5       22.    Defendant United Airlines is a Delaware corporation with its principal

6  place of business at 77 W. Wacker, Chicago, IL 60601. United Airlines is one of the

7  largest passenger airlines in the world with more than 3,600 flights a day to more

8  than two hundred destinations. United Airlines conducts Passenger Air

9  Transportation throughout the world, including into the United States, especially San

10  Francisco International Airport, where United Airlines operates a hub and

11  maintenance operation center. United Airlines is the largest employer in San Mateo

12  County, California, which is located within this district.

13      **C.**    **Unnamed Co-Conspirators**

14       23.    At all relevant times, other airlines, trade groups, or other entities,

15  willingly conspired with Defendants in their unlawful restraint of trade. All

16  averments herein against named Defendants are also averred against these unnamed

17  co-conspirators as though set forth at length.

18      **D.**    **Agents**

19       24.    The acts alleged to have been done by Defendants were authorized,

20  ordered or done by their directors, officers, agents, employees, or representatives

21  while actively engaged in the management of each of the Defendants' affairs.

22

23                          **TRADE AND COMMERCE**

24       25.    Throughout the Class Period, there was a continuous and uninterrupted

25  flow of Passenger Air Transportation in international commerce throughout the

26  United States and especially into and out of Los Angeles and San Francisco.

27  Defendants' unlawful activities, as described herein, took place within the flow of

28  commerce to Passenger Flight customers throughout the world, and had a direct,

- 6 -

1    substantial and reasonably foreseeable effect upon interstate and international
2    commerce in the United States.

3    ## PLAINTIFF AND THE CLASS SUFFERED INJURY THROUGH
4    ## COLLUSIVE PRICE INCREASES AND SURCHARGES

5        26.    As Defendants controlled a vast majority of the Passenger Flight
6    services during the Class Period with their dominant combined market share,
7    Passenger Flight customers were unable to shop for Passenger Air Transportation
8    from other carriers during that period, because of the lack of competition which
9    allowed Defendants to reap enormous profits from the Fuel Surcharges.

10        27.    In addition, Fuel Surcharges were often treated by Defendants and other
11    carriers similar to a tax or other surcharge, such as an airport facility charge or a
12    government mandated September 11 security charge. As such, Fuel Surcharges were
13    not always advertised as part of Defendants' fares, and were added on to the base fare
14    as part of the purchase transaction.

15        28.    Because surcharges generally are designed to compensate for increased
16    external costs, they should bear a relatively constant relationship to external cost
17    levels. Thus, in a competitive market, Fuel Surcharges should rise and fall at
18    relatively constant ratios to the associated jet fuel costs. Since their inception in
19    2004, the ratio of Defendants' Surcharges to external costs has increased steadily.
20    The Fuel Surcharges bore no relationship to the Defendants' actual fuel costs or fuel
21    cost increases.

22        29.    The ratio of Defendants' profits to external costs was therefore quite
23    high due to the concerted implementation and maintenance of the agreed-upon
24    Passenger Air Transportation and Fuel Surcharge price levels. So despite increased
25    fuel costs during the Class Period, Defendants' Surcharges were actually responsible
26    for outstanding profit growth for Defendants beyond record fuel costs.

27    / / /

28    / / /

- 7 -

## CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who purchased passenger air transportation for long haul transpacific flights and who paid a fuel surcharge on their tickets from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from 2004 to August 2007.

31.    Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of Class members. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all Class members is impracticable. It is estimated that there were more than 15 million passengers traveling to the Pacific out of California in 2006.

32.    There are questions of law or fact common to the Class, including:

a.    Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, and/or stabilize Passenger Air Transportation and Surcharge prices charged effecting commerce in the United States and throughout the world;

b.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

c.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

- 8 -

1           d.     Whether the conduct of Defendants, as alleged in this Complaint,

2   caused injury to the businesses or property of Plaintiffs and the other members

3   of the Class;

4           e.     The effect of Defendants' conspiracy on the Passenger Air

5   Transportation and Surcharge prices charged in the United States and

6   throughout the world during the Class Period; and

7           f.     The appropriate measure of damages sustained by Plaintiffs and

8   other members of the Class.

9        33.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the

10   claims of the Class members. Plaintiff will fairly and adequately protect the interests

11   of the Class. Plaintiff purchased Passenger Air Transportation with Surcharges from

12   one or more Defendants, and his interests are coincident with and not antagonistic to

13   those of other members of the Class. Plaintiff is represented by counsel competent

14   and experienced in the prosecution of antitrust and class action litigation.

15        34.    The questions of law and fact common to the members of the Class

16   predominate over any questions affecting only individual members.

17        35.    A class action is superior to other methods for the fair and efficient

18   adjudication of this controversy. Treatment as a class action will permit a large

19   number of similarly situated persons to adjudicate their common claims in a single

20   forum simultaneously, efficiently, and without the duplication of effort and expense

21   that numerous individual actions would engender.

22        36.    Class treatment will also permit the adjudication of relatively small

23   claims by many Class members who otherwise could not afford to litigate an

24   antitrust claim such as is asserted in this Complaint.

25        37.    This class action presents no difficulties in management that would

26   preclude maintenance as a class action. Finally, the Class is readily definable and is

27   one for which records of the names and addresses of the members of the Class exist

28   in. the files of Defendants.

- 9 -

## DEFENDANTS AND THE PASSENGER FLIGHT MARKET

38.    Each Defendant possesses significant market share on their routes of travel. The principal competitors for the Defendants in the transpacific long haul Passenger Air Transportation market are therefore one another.

39.    Passenger Air Transportation is a commodity product that is fungible in the sense that Passenger Air Transportation provided by any one airline is readily substitutable for the Passenger Air Transportation provided by any other airline.

40.    Passenger Air Transportation is a homogenous service sold by airlines, including Defendants, to airline customers, including Plaintiff and the members of the Class, primarily based on price.

41.    The Passenger Air Transportation market in the United States and worldwide is highly concentrated, and there exists substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANTS' CONCERTED FUEL SURCHARGES

42.    Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

43.    Beginning in 2004, Defendants agreed to act in concert with one another in demanding the Surcharges to defray fuel costs and agreeing when and how much to increase the Surcharges to their Passenger Flight customers.

44.    Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise surcharges at the same times and in the same amounts.

1   45.    But for Defendants' Passenger Air Transportation conduct, Defendants

2   would have been unable to perpetrate the extent to which they increased the prices of

3   their Fuel Surcharges.

4   46.    The collusion of Japan Airlines International and All Nippon Airways

5   ("ANA") is representative of the behavior of the other Defendants. Japan Airlines

6   International and ANA agreed to raise and. lower fares on nearly always the same

7   dates and were in lockstep on surcharges for transpacific fares:

8

| | |
|---|---|
| June 8, 2004, ANA files a notice with the Japanese government to raise IATA international fares, in the wake of increased fuel price, to and from Japan, effective **July 1**, 5% hike, exception North America economy fares, but not business class. | June 8, 2004, Japan Airlines files a notice with the Japanese government to raise international fares, in the wake of increased fuel prices, to and from Japan, effective **July 1**, 5% hike, exception North American economy fares, but not business class. |
| January 5, 2005, ANA announces it will add fuel surcharges on international fares on **February 1**. The surcharges for transpacific flights were 2,500 yen. | January 20, 2005, Japan Airlines announces it will add fuel surcharges on international passenger fares on **February 1**. The surcharges for transpacific flights were 2,500 yen. |
| June 3, 2005, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge effective **July 1**. | June 7, 2005, ANA files a notice with the Japanese government to raise its international fuel surcharge effective **July 7**. |
| January 16, 2006, Japan Airlines files a notice with the Japanese | January 23, 2006, ANA files a notice with the Japanese government to |

CLASS ACTION COMPLAINT

| | |
|---|---|
| government to raise its international fuel charge effective **March 1**. | raise its international fuel surcharge effective **March 1**. |
| August 17, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge, effective **October 1**, from 8,000 yen to 13,600 yen ($66 to $133). | August 31, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective **October 15**, from 8,000 yen to 13,600 yen ($66 to $113). |
| November 16, 2006, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). | November 16, 2006, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **January 1**, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). |
| March 19, 2007, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91. | March 20, 2007, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective **May 1**, to 11,000 yen or $91. |
| May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 1**, from 11,000 yen or $91 to 12,000 yen or $100. | May 25, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **July 10**, from 11,000 yen or $91 to 12,000 yen or $100. |

| | |
|---|---|
| August 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen or $108. | August 20, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective **October 1**, from 12,000 yen or $100 to 13,000 yen or $108. |

## CARTEL-LIKE TRADE ORGANIZATIONS

47.    Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific Airlines,  Oneworld, Star Alliance and SkyTeam Alliance.  At one or more of these meetings Defendants conspired to artificially inflate fuel Surcharges on international passenger air transportation.

48.    One of the keys to the conspiracy is the 42-year-old Association of Asia Pacific Airlines ("AAPA").  The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tons of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively."  Ten of the defendants are members of AAPA.

49.    The primary purpose of AAPA is to serve as a forum for members' views on issues of common interest and to foster close cooperation.  According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the

- 13 -

1    airlines feel they can work together for mutual benefit. In addition, AAPA retains

2    access to specialized legal and aviation consultants in Brussels and Washington, a

3    reflection of the significant impact which the profusion of U.S. and E.U. regulatory

4    developments have on all international carriers including Asia Pacific airlines."

5        50. AAPA was formed during a meeting of Asian airline executives in 1965

6    to discuss regional cooperation. The following year, Philippine Airlines, China

7    Airlines, Korean Airlines and Malaysian Airlines officially formed the Orient

8    Airlines Research Bureau. The group evolved into the Orient Airlines Association

9    and in 1996 changed its name to Association of Asia Pacific Airlines.

10       51. Another key to the conspiracy is the Geneva-based International Air

11   Transport Association. All of the defendants are members of the IATA, which was

12   founded in 1945 in Havana, Cuba. IATA represents more than 240 airlines

13   comprising 94% of scheduled international air traffic. It describes itself as "the prime

14   vehicle for inter-airline cooperation." It was an agreement reached at an IATA

15   meeting in Geneva on May 28, 2004 that played a role in triggering the fuel

16   Surcharge conspiracy.

17       52. **Alliance memberships by airline:**

18   **Air New Zealand**

19       Member of the Association of Asia Pacific Airlines.

20       Member of the Star Alliance.

21       Member of the International Air Transport Association.

22   **All Nippon Airways**

23       Member of the Association of Asia Pacific Airlines.

24       Member of the Star Alliance.

25       Member of the International Air Transport Association.

26   **American Airlines**

27       Member of Oneworld.

28       Member of the International Air Transport Association.

1  **Cathay Pacific Airways**

2       Member of the Association of Asia Pacific Airlines.

3       Member of Oneworld.

4       Member of the International Air Transport Association.

5  **China Airlines**

6       Member of the Association of Asia Pacific Airlines.

7       Member of the International Air Transport Association.

8  **EVA Airlines**

9       Member of the Association of Asia Pacific Airlines.

10      Member of the International Air Transport Association.

11  **Japan Airlines International**

12      Member of the Association of Asia Pacific Airlines.

13      Member of Oneworld.

14      Member of the International Air Transport Association. Malaysia Airlines

15      Member of the Association of Asia Pacific Airlines.

16      Member of the International Air Transport Association.

17  **Northwest Airlines**

18      Member of the SkyTeam Alliance.

19      Member of the International Air Transport Association.

20  **Qantas Airways**

21      Member of the Association of Asia Pacific Airlines.

22      Member of Oneworld.

23      Member of the International Air Transport Association.

24  **Singapore Airlines**

25      Member of the Association of Asia Pacific Airlines.

26      Member of the Star Alliance.

27      Member of the International Air Transport Association.

28  / / /

CLASS ACTION COMPLAINT

**Thai Airways**

Member of the Association of Asia Pacific Airlines.

Member of the Star Alliance.

Member of the International Air Transport Association.

**United Airlines**

Member of the Star Alliance.

Member of the International Air Transport Association.

## CODE SHARING BUSINESS PARTNERSHIPS

53.    In addition to the four different alliances/trade groups, various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines combined services between an array of U.S. and Australian cities. Code sharing is a legal business arrangement. However, it provides a mechanism to conduct illegal activity.

54.    A code share is part of a "cooperative services" agreement between the two carriers. It refers to the practice where a flight operated by an airline is jointly marketed as a flight for one or more other airlines. Most major airlines today have code sharing partnerships with other airlines. "Code" refers to the identifier used in flight schedule, generally the 2-character International Air Transport Association airline designator code and flight number. For example, YY123, flight 123 operated by the airline YY, could be sold by airline ZZ as ZZ456. It is a business partnership that allows airlines to earn revenue by selling tickets on a partner's flight.

55.    According to the U.S. Department of Transportation and Defendants, the following are the code sharing partnerships of the defendants listed alphabetically:

Air New Zealand / EVA Airways

Air New Zealand / Qantas (Tasman route)

Air New Zealand / Japan Airlines International

- 16 -

| | |
|---|---|
| 1 | Air New Zealand / Northwest Airlines |
| 2 | Air New Zealand / Singapore Airlines |
| 3 | Air New Zealand / Thai Airways |
| 4 | Air New Zealand / United Airlines |
| 5 | All Nippon Airways / Asiana Airlines |
| 6 | All Nippon Airways / EVA Airways |
| 7 | All Nippon Airways / Malaysia Airlines |
| 8 | All Nippon Airways/Singapore Airlines |
| 9 | All Nippon Airways / United Airlines |
| 10 | China Airlines / American Airlines |
| 11 | Cathay Pacific Airways / American Airlines |
| 12 | Cathay Pacific Airways / Japan Airlines International |
| 13 | China Airlines / Thai Airways |
| 14 | EVA Airways / Air New Zealand |
| 15 | EVA Airways / American Airlines |
| 16 | EVA Airways / All Nippon Airways |
| 17 | EVA Airways / Qantas |
| 18 | EVA Air / American Airlines |
| 19 | Japan Airlines International / Air New Zealand |
| 20 | Japan Airlines International /American Airlines |
| 21 | Japan Airlines International / Cathay Pacific |
| 22 | Japan Airlines International / Korean Air |
| 23 | Japan Airlines International / Northwest Airlines |
| 24 | Japan Airlines International / Qantas Airlines |
| 25 | Japan Airlines International / Singapore Airlines |
| 26 | Japan Airlines International / Thai Airways |
| 27 | Malaysia Airlines / All Nippon Airways |
| 28 | Malaysia Airlines / Thai Airways |

1    Northwest Airlines / Air New Zealand

2    Northwest Airlines / Asiana Airlines

3    Northwest Airlines / Japan Airlines International

4    Northwest Airlines / Korean Air

5    Qantas Airways / Air New Zealand

6    Qantas Airways / American Airlines

7    Qantas Airways / EVA Airways

8    Qantas Airways / Japan Airlines International

9    Singapore Airlines / Air New Zealand

10    Singapore Airlines / Asiana Airlines

11    Singapore Airlines / All Nippon Airways

12    Singapore Airlines / Malaysian Airlines

13    Singapore Airlines / United Airlines

14    Thai Airways / Air New Zealand

15    Thai Airways / China Airlines

16    Thai Airways / Japan Airlines International

17    Thai Airways / Malaysia Airlines

18    Thai Airways / United Airlines

19    United Airlines / Air New Zealand

20    United Airlines / All Nippon Airways

21    United Airlines / Asiana Airlines

22    United Airlines / Singapore Airlines

23    United Airlines /Thai Airways

24    ## CARTEL ACTIVITY MEETINGS

25    56.    Over the years, executives of Defendant airlines have attended

26    numerous meetings where cartel-like activity was accomplished.  Here are a few

27    examples of meetings where executives discussed and agreed on fuel surcharges:

28

- 18 -

57.    **The International Air Transport Association, Special Meeting, Geneva, May 28, 2004**. Fuel costs were the main topic of this meeting and there were agreements on how to add surcharges for fuel. The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air Transport Association might raise international fares by as much as five percent to help cover a surge in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA spokesperson said."

58.    **The International Air Transport Association Annual General Meeting and World Air Transport Summit, Singapore, June 6-8, 2004**. More than 600 airline executives attended this annual summit. Giovanni Bisignani, IATA CEO said in a welcoming statement, "While record high fuel prices challenge our profitability it is time to put our efforts toward rebuilding the industry." Immediately following this meeting on June 8, 2004, both Japan Airlines International and All Nippon Airways filed applications with the Japanese government to raise international passenger fares because of high fuel costs. In a news release announcing the Fuel Surcharge hike, Japan Airlines International said:

> **"The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."**

Japan Airlines International and All Nippon Airways were in lockstep on June 8, 2004, both announcing on that day that a five percent fuel Surcharge would be go into effect, on the same day for both airlines, July 1, 2004.

59.    **2005 International Flight Services Association, Global Leadership Conference - Asia Pacific, August 30 - September 1, 2005 Tokyo Japan:** This meeting was labeled as "The Challenge of Change." Among the participants were, Makoto Fukada, Managing Director and Senior Vice President International

1    Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design,

2    Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways;

3    Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager,

4    Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi

5    Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana

6    Airlines.

7         60. **2nd Annual Asia Pacific & Middle East Aviation Outlook Summit**

8    **2006, December 5-6, 2005 Kuala Lumpur, Malaysia**: The theme of this meeting

9    was "Towards Best Practice; Maximising Revenues and Minimising Costs." On the

10   first day of the meeting, the guests included Dato Seri Bashir Ahmad, Malaysia

11   Airport's CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airways;

12   and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel

13   surcharges were a topic of discussion.

14        61.     **Aviation Emergency Response 2006, AAPA sponsored, September**

15   **19-21, 2006 Bangkok, Thailand:** This meeting was attended by international

16   airport officials and AAPA member executives. Meetings were held on increasing

17   revenues in the transpacific area by way of Fuel Surcharges and other financial

18   means.

19        62.     **3rd Annual Asia Pacific & Middle East Aviation Outlook Summit,**

20   **November 9-10, 2006 Singapore:** Participating in this meeting were executives

21   from most of the Defendant airlines, including Geoff Dixon, CEO of Qantas and

22   Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues

23   presented and discussed was *"Fighting Costs: Fuel prices and managing risk*

24   *exposure."*

25        63.     **AAPA Forum, November 28-29, 2006 Bandar Seri Begawan, Brunei**

26   **Darussalam:** More than 120 aviation industry stakeholders attended this meeting,

27   organized by AAPA. At this meeting, Defendants and others discussed surcharges.

28

64.    **Asia Pacific Aviation Summit, July 24-25, 2007 Sydney, Australia:** This meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

## THE INVESTIGATION

65.    The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast. The DOJ announced on August 1, 2007 a \$300 million settlement with British Airways and it cited passenger transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

66.    The DOJ also focused on **transpacific** flights to and from the United States, noting that investigation is "ongoing" and includes other Defendants named herein.

67.    The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

68.    Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can apply for leniency from the Department of Justice for its participation in antitrust activities. Under the so-called Corporate Leniency Program, if a company comes forward with information about antitrust activities and

- 21 -

1   cooperates in the investigation, it is eligible for conditional amnesty from
2   prosecution.

3       69.    Both Korean Air and Asiana Airlines are among the top transpacific
4   carriers in the world. It was not the first time Korean Air and Asiana Airlines have
5   been implicated in collusion and anticompetitive behavior. The Korean Fair Trade
6   Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger air
7   transportation services in Korea.

8       70.    In addition, several of the Defendants and unnamed co-conspirators
9   have been identified as targets and or subjects in international investigations by the
10  U.S. Department of Justice and the European Union into air cargo fuel surcharge
11  price fixing. The targets, many of which are also named in civil suits, include
12  Defendant All Nippon Airways, Defendant American Airlines, Asiana Airlines,
13  Defendant Japan Airlines, Korean Airlines, Defendant Northwest Airlines,
14  Defendant Qantas Airways and Defendant United Airlines. In both the air passenger
15  and cargo investigations, Defendants and other airlines are accused of developing
16  and participating in conspiracies to increase revenue by assessing inflated Fuel
17  Surcharges.

18  ## ADMISSIONS BY CO-CONSPIRATORS

19      71.    On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon
20  announced that Qantas Airways would set aside $40 million to cover a potential fine
21  in the United States as a result of Fuel Surcharges and price fixing in its freight
22  division. In a news release, Dixon was quoted as saying:

23      "On 1 August 2007, the U.S. Department of Justice announced that British
24      Airways and Korean Air had agreed to plead guilty and pay separate US$300
25      million criminal fines for their roles in conspiracies to fix prices of passenger
26      and cargo flights. British Airways subsequently announced that US$200
27      million of its fine related to cargo. Based on these developments, a decision

28

- 22 -

1      has been made to make a US$40 million (A$47 million) provision in the

2      2006/07 Financial Accounts;"

3 Dixon also was quoted as saying:

4      "We have investigated this issue thoroughly and are confident that the

5      unacceptable conduct was limited to a small number of people."

6     72.    On October 6, 2007, the Japanese daily newspaper Asahi Shimbun

7 reported that Japan Airlines international would book a roughly $171 million charge

8 for potential fines from a global price fixing probe by U.S. and European Union

9 officials. The newspaper said:

10      "The company's move comes after the U.S. Justice Department fined British

11      Airways PLC and Korean Air Lines Co. $300 million each in August for

12      fixing the prices of passenger and cargo flights with other airlines. The

13      companies allegedly conspired to set fuel surcharges when oil prices rose."

14

15 ## VIOLATIONS ALLEGED

16     73.    During the Class Period Defendants engaged in a continuing

17 agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix,

18 maintain, and/or stabilize the prices of Passenger Air Transport and Fuel Surcharges

19 in the United States and throughout the world in violation of Section I of the

20 Sherman Act, 15 U.S.C. § 1.

21     74.    In formulating and effectuating the alleged contract, combination, or

22 conspiracy, Defendants engaged in anti-competitive activities, the purpose and effect

23 of which were to artificially raise, fix, maintain, and/or stabilize the prices of

24 Passenger Air Transport and Fuel Surcharges. These activities included the

25 following:

26     a.    agreeing to charge prices of Passenger Air Transport and Fuel

27 Surcharges at certain levels and otherwise to fix, raise, maintain, and/or stabilize the

28

- 23 -

CLASS ACTION COMPLAINT

1    prices of Passenger Air Transport and Fuel Surcharges charged in the United States

2    and throughout the world;

3        b.     charging Passenger Air Transport and Fuel Surcharges at the agreed-

4    upon rates;

5        c.     signaling increases in the price of Passenger Air Transport and Fuel

6    Surcharges by, *inter alia*, publicly announcing their increases;

7        d.     moving prices of their Passenger Air Transport and Fuel Surcharges in

8    lockstep; and

9        e.     announcing new Passenger Air Transport and Fuel Surcharges prices

10    nearly simultaneously or within days of each other.

11        75.     During the Class Period, the Defendants increased, as a ratio to external

12    costs - and profits - the Passenger Air Transport and Fuel Surcharges they charged.

13    These increases in Passenger Air Transport and Fuel Surcharges cannot be explained

14    by actual increases in fuel prices or supply/demand forces, but rather were the result

15    of anticompetitive conduct.

16        76.     During the Class Period, Plaintiff and members of the Class purchased

17    Passenger Air Transportation directly from Defendants (or their agents, subsidiaries,

18    and/or controlled affiliates).

19        77.     The illegal combination and conspiracy alleged herein has had the

20    following effects, among others:

21        a.     Price competition in the pricing of Passenger Air Transportation and

22    Fuel Surcharges thereon has been restrained, suppressed, and/or eliminated;

23        b.     Price competition in the contracting of Passenger Air Transportation has

24    been restrained, suppressed, and/or eliminated;

25        c.     Prices for Passenger Air Transportation and Fuel Surcharges thereon

26    charged by Defendants have been fixed, raised, maintained, and/or stabilized at

27    artificially high, non-competitive levels; and

28

1          d.    Members of the Class have been deprived of the benefit of free and

2    open competition.

3    **FRAUDULENT CONCEALMENT**

4          78.    Throughout the relevant period, Defendants affirmatively and

5    fraudulently concealed their unlawful conduct from Plaintiff and the Class.

6          79.    Plaintiff and the members of the Class did not discover, and could not

7    discover through the exercise of reasonable diligence, that Defendants were violating

8    the antitrust laws as alleged herein until shortly before this litigation was

9    commenced.  Nor could Plaintiff and the members of the Class have discovered the

10   violations earlier than that time because Defendants conducted their conspiracy in

11   secret, concealed the nature of their unlawful conduct and acts in furtherance thereof,

12   and fraudulently concealed their activities through various other means and methods

13   designed to avoid detection. The conspiracy was by its nature self-concealing.

14         80.    Plaintiff and the members of the Class could not have discovered the

15   unlawful conduct at an earlier date through the exercise of reasonable diligence

16   because of Defendants' active and purposeful concealment of their unlawful

17   activities.

18         81.    Defendants engaged in a successful, illegal price-fixing conspiracy with

19   respect to Surcharges and other fees, which they affirmatively concealed, in at least

20   the following respects:

21         a.    By agreeing among themselves not to discuss publicly, or otherwise

22   reveal, the nature and substance of the acts and communications in furtherance of

23   their illegal scheme;

24         b.    By engaging in secret meetings and telephone calls in order to further

25   their illicit Passenger Air Transportation and Fuel Surcharges cartel; and/or

26         c.    By giving false and pretextual reasons for their pricing for Passenger

27   Air Transportation and Fuel Surcharges thereon, and their increases, during the

28

1    relevant period and by describing such pricing and increases falsely as being the

2    result of external costs rather than collusion.

3        82.    As a result of Defendants' fraudulent concealment of their conspiracy,

4    Plaintiffs and the Class assert the tolling of any applicable statute of limitations

5    affecting the rights of action of Plaintiff and the members of the Class.

6

7                        **INJURY TO PLAINTIFF AND THE CLASS**

8        83.    During the Class Period, Plaintiff and the members of the Class,

9    because of Defendants' antitrust violations, paid Surcharges and other fees they

10    would not have paid absent such violations.

11        84.    As a result, Plaintiff and the members of the Class it seeks to represent

12    have been injured and damaged in their business and property in an amount to be

13    determined according to proof.

14        85.    As a direct and proximate result of the illegal conspiracy, Plaintiff and

15    the members of the Class have been injured and financially damaged in their

16    respective businesses and property, in that they have paid Surcharges and other fees

17    during the Class Period they would not have paid in the absence of the illegal

18    conspiracy.

19                              **PRAYER FOR RELIEF**

20    WHEREFORE, Plaintiff prays that:

21        A.    The Court determine that this action may be maintained as a class action

22    under Rule 23 (a) and (b) (3) of the Federal Rules of Civil Procedure;

23        B.    The Court adjudge and decree that the contract, combination and

24    conspiracy alleged herein is a per se unreasonable restraint of trade in violation of

25    Section i of the Sherman Act;

26        C.    Judgment be entered against Defendants, jointly and severally, and in

27    favor of Plaintiffs and the Class for damages as allowed by law as determined to

28    have been sustained by them;

- 26 -

D.    Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition:

E.    The Court awards Plaintiff and the Class attorneys' fees and costs, and pre judgment and post judgment interest as permitted by law; and

F.    The Court awards Plaintiff and the Class such other and further relief as may be necessary and appropriate.

DATED: December 18, 2007              KABATECK BROWN KELLNER LLP

By: _____
Brian S. Kabateck
Attorneys for Plaintiff and the Class

- 27 -

CLASS ACTION COMPLAINT

## JURY TRIAL DEMAND

Pursuant to Federal rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: December 18, 2007         KABATECK BROWN KELLNER LLP


By: _____
        Brian Kabateck
        *Attorneys for Plaintiff and the Class*

- 28 -